## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| GEORGE ZELINSKI, JANICE LYNN ZELINSKI and BRADLEY A. ZELINSKI, individually and as Trustee of the BRADLEY A. ZELINSKI LIVING TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>SECURIAN FINANCIAL GROUP, INC., MINNESOTA LIFE INSURANCE COMPANY, EDIE A. JARVIS, JARVIS FINANCIAL, INC. and SHURWEST, LLC<br><br>Defendants. | Case No.: 2:19 cv 00804-SPC-MRM<br><br>**PLAINTIFFS' COMPLAINT FOR:**<br>**1.  Violation of the Federal Securities Act of 1933**<br>**2.  Breach of Contract**<br>**3.  Breach of Fiduciary Duty**<br>**4.  Negligent Misrepresentation**<br>**5.  Negligence**<br>**6.  Professional Negligence**<br>**7.  Violation of Florida's Securities and Investor Protection Act**<br><br>**DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT

Plaintiffs George Zelinski, Janice Zelinski and Bradley A. Zelinski, individually and as Trustee of the Bradley A. Zelinski Trust (collectively, "Plaintiffs"), allege the following against Securian Financial Group, Inc. ("Securian Financial"), Minnesota Life Insurance Company ("Minnesota Life"), Jarvis Financial, Inc. ("Jarvis Financial"), Edie A. Jarvis ("Jarvis" or "Ms. Jarvis") and Shurwest, LLC. ("Shurwest") (collectively "Defendants").  Hereinafter, Minnesota Life and Securian may be referred to as "Minnesota" or "Minnesota Life" and Jarvis Financial and Jarvis may be referred to as "Jarvis," "Ms. Jarvis" or the "Jarvis Defendants."

### I.       SUMMARY OF CLAIMS

1.       This case involves violations of the Federal Securities Act of 1933, breach of contract, breach of fiduciary duty, negligent misrepresentations, negligence, professional negligence and violations of the Florida Securities and Investor Protection Act, all in connection with Defendants' sale of a life insurance policy to Plaintiffs George and Janice Zelinski, funded by

these Plaintiffs' purchases of unregistered securities, and a related investment purchase by their son Bradley Zelinski.

2.      Defendants, individually and collectively, induced Plaintiffs, through negligent misrepresentations and omissions, to liquidate their conservatively invested life savings in the amount of approximately $2,700,000 and to use the funds so liquidated to purchase investments in concentrated positions of Future Income Payments, LLC ("FIP") unregistered securities so as to permit the purchase of and to sustain the annual payments for a Minnesota Life permanent indexed universal ("IUL") life insurance policy (the "Policy").

3.      Defendants negligently failed to inform and warn Plaintiffs that the Jarvis Defendants' recommended purchases of the Policy and the FIP unregistered securities carried significant risks, were costly, and not in their best interests and that the FIP investments were unregistered investments sold in violation of the Federal Securities Act of 1933 and the Florida Securities and Investor Protection Act.  Each of Defendants negligently further failed to inform and warn Plaintiffs that the annual premiums due to sustain the Policy were unaffordable to them, and that they ran a high risk of a lapse of the Policy, in the event the FIP securities were worthless or decreased in value.

4.      None of the Defendants ever informed or warned Plaintiffs that FIP had a history of preying on senior citizens, disabled veterans and retirees living on fixed pension or income streams. As of the time Plaintiffs agreed to invest their funds, unbeknownst to Plaintiffs, FIP had been the subject of investigations by state regulators in New York, California, Massachusetts, Iowa, Washington, and North Carolina, and perhaps elsewhere, something each of Defendants knew or should have known before making the recommendations described herein.

5.     For example, in March 2016, the Massachusetts Attorney General announced that FIP agreed to provide more than $2 million in debt relief to resolve allegations that it made predatory and illegal loans to Massachusetts consumers. FIP was also barred from making these loans in Massachusetts in the future.

6.     On November 23, 2016, the Federal Consumer Financial Protection Bureau ("CFP") served FIP with a Civil Investigative Demand, demanding information related to the company's income stream-advance transactions, due to FIP's predatory lending practices, another fact about which Plaintiffs were unaware.  On May 17, 2017, U.S. District Judge Josephine L. Staton of the Central District of California issued an Order authorizing the CFP to continue its investigation into FIP's business practices.

7.     In February 2017, mere months prior to Plaintiffs' investments, the City of Los Angeles filed suit against FIP, alleging that the company charged usurious, hidden interest rates as high as ninety-six percent, prohibited early termination of the loans (thereby ensuring that consumers could not avoid the high interest rates), and employed abusive collection practices.

8.     And in May 2017, FIP was the subject of investigations by state regulators in New York, California, Massachusetts, Iowa, Washington, and North Carolina.

9.     Each of Defendants negligently concealed from Plaintiffs or failed to discover these facts.  Plaintiffs had no knowledge or suspicion of any of these issues until approximately April 2018 when FIP's President announced FIP had ceased the majority of its operations and would make no further payments to investors as a result of the ongoing regulatory actions and litigation FIP faced.

10.     Defendants' individual and collective acts establish statutory strict liability claims as well as other torts and negligence.

11.     The strict liability claims are of significant importance since they do not require proof of causation or intent and the statutory remedy is, *inter alia*, rescission of all the transactions.

12.     FIP was an unregistered and non-exempt securities offering sold by unlicensed persons, including the Jarvis Defendants.

13.     None of the Defendants possessed the necessary state or federal securities licenses and/or the Financial Industry Regulatory Authority ("FINRA") licenses to make securities recommendations or engage in the sale of unregistered securities.

14.     Defendants Minnesota Life and Securian Financial and Shurwest, as principals, were responsible for the wrongful conduct of their employees as well as their agents, the Jarvis Defendants.

15.     Defendants Minnesota Life and Securian Financial, as principals, were responsible for the wrongful conduct of their employees as well as their agent, Shurwest.

16.     Each of Defendants negligently failed to conduct due diligence which would have uncovered the fact that FIP was a *Ponzi* scheme and was conducting an illegal business enterprise.

## II.     PARTIES

*Plaintiffs*

17.     Plaintiffs George and Janice Lynn Zelinski are a married couple residing in the State of Florida in Alva, Florida.  At all relevant times, they were retired or semi-retired and living on a fixed income stream.  George is 61 years old and Janice is 54 years old.

18.     George Zelinski is originally from Jersey City, New Jersey where he attended parochial school until he moved to Willington, Illinois at age 12 where he continued his parochial education until transferring to public high school from which he graduated in 1976.  Thereafter, he attended Lewis University in Romeoville, Illinois for three years, following which he became

employed in the insurance and real estate industry.  Thereafter, he went into the building and development business, the fabricated steel business and the bowling ball design and manufacture business until the year 2000 when Mr. Zelinski began to experience health issues which continue to this day.  He suffers from severe GERD, endocrine system failure (adrenal problems), fallen arches which has required titanium implants, hyperplasia of the pituitary gland, hypogonadism, hypothyroidism as well as depression. All of these have rendered him unable to work and uninsurable for life insurance purposes and were disclosed to the Jarvis Defendants at all relevant times.

19.     Janice Zelinski is originally from Lockport, Illinois and attended public school graduating from Lockport High School in 1983.  She and Mr. Zelinski married in 1984 and she assisted Mr. Zelinski in the building business thereafter.  She gave birth to their son Brad Zelinski in 1985 and, living in their business' model home, she was able to perform administrative duties in the building business while raising their son.  She worked in retail at a Safeway and a Target store from 1999 to 2008.  She has worked as a supervisor at World Market since May 2018 when she realized that she would have to return to the workforce due to the failure of FIP to continue the payments Plaintiffs' anticipated receiving.

20.     Plaintiff Bradley A. Zelinski also resides in the State of Florida in Alva, Florida. He was born in Joliet, Illinois and is 34 years of age.  He graduated high school in Cedarpark, Texas in 2004 and went to a local community college for two years before attending the University of Texas for about one year before leaving to pursue a career as a professional golfer.  However, when that did not materialize, he decided in 2007 to find work in retail for several years before trying his hand in banking, following which he worked at DSW before experiencing significant foot problems, including plantar fasciitis and bone spurs requiring specialized treatment in 2015.

He was told he could no longer work at a job involving a great deal of standing.  He is currently attempting to earn a living in the casualty and property insurance sales business.  He is the Trustee of the Bradley A. Zelinski Trust which was created in or around 2016.

21.     In July 2016, George Zelinski's father, George J. Zelinski, died at age 79 and left his estate to Plaintiffs George and Brad Zelinski, in the amount of about $3 million.  These are the funds that were used by Plaintiffs to invest in the Minnesota Life plan using the FIP structured settlement funds and represent all, or practically all, of Plaintiffs' investable assets.

***Minnesota Life***

22.     Minnesota Life is a Minnesota insurance corporation headquartered in St. Paul, Minnesota and is a subsidiary of Defendant Securian Financial.

23.     Securian Financial is a Delaware corporation with headquarters in St. Paul, Minnesota and is the parent company of Defendant Minnesota Life.

24.     At all relevant times, Minnesota Life was authorized to offer and sell life insurance products in the State of Florida.  At all relevant times, it authorized the Jarvis Defendants to act as its duly appointed agent for the offer and sale of life insurance products in the State of Florida.

25.     Minnesota Life operates through its duly chosen agents and brokers.

26.     Minnesota Life exercises control over its agents, such as Shurwest and the Jarvis Defendants, in the sale, funding and approval of Minnesota Life insurance products by, including but not limited to, requiring its agents to:

    a.  follow specific guidelines in the sale of policies;
    b.  fill out a Representative's Report;
    c.  advise the purchaser of Minnesota insurance products that the agent is acting on behalf of Minnesota;
    d.  solicit and procure applications for insurance for Minnesota Life;
    e.  remit all applications and premiums to Minnesota Life;
    f.  service Minnesota Life policy holders; and
    g.  conduct themselves with the highest principles of honesty, integrity, and pride.

*Shurwest*

27.     Defendant Shurwest is an Arizona limited liability company.  At all relevant times, Shurwest was a "Master Brokerage General Agent" and "Broker" pursuant to contracts with Minnesota Life and Securian Financial.  In that capacity it engaged in the activities described herein.

28.     Shurwest is licensed by the State of Florida to sell life insurance in this State and holds license No. L037511.

29.     Shurwest was, upon information and belief, a member of the Securian Financial Network, a nationwide network of financial services firms whose purpose is to provide financial planning and advice to their clients, such as Plaintiffs.  The Securian Financial Network has been touted on the Securian website as a "long-term resource to provide expertise and create strategies" to help clients and their families "achieve [their] financial goals."

30.     Shurwest marketed, promoted and sold life insurance products and FIP products to insureds and assisted and directed members of the Securian Financial Network in the marketing, promotion, and sale of life insurance policies. Shurwest also provided "services" to IUL policyholders (such as Plaintiffs), including premium finance products, education, marketing, and distribution.

31.     When a financial advisor-broker who used Shurwest's services, such as the Jarvis Defendants, sold a Minnesota Life IUL policy, Shurwest received a portion of the commission Minnesota Life paid to the financial advisor-broker.

32.     Shurwest also served as an Independent Marketing Organization ("IMO"). As one court explained the function of IMO's:

> Insurance companies generally do not recruit independent insurance agents to sell their products. Instead, IMOs recruit independent insurance agents to sell [fixed index annuities] and other types of insurance products to the independent agents' clients. An IMO serves as a third-party intermediary between the agents and the insurance companies, providing product education, marketing, and distribution services. Insurance companies generally compensate IMOs for their support services based on a percentage of agent sales volume.

> *Mkt. Synergy Group, Inc. v. United States Dep't of Labor*, 16-CV-4083-DDC-KGS,   2016 WL 6948061, at *3 (D. Kan. Nov. 28, 2016).

33.     Pursuant to its Master Brokerage General Agreement with Minnesota Life and Securian Financial, Shurwest agreed to supervise brokers such as the Jarvis Defendants to ensure they complied with applicable insurance laws and regulations governing the sales and servicing of Minnesota Life IUL policies. Shurwest also agreed to review all insurance applications before submitting them to Minnesota Life to insure they were properly completed.

34.     In the Master Brokerage General Agreement and in Broker Sales Contracts, Shurwest also agreed to comply and require its financial advisor-brokers to comply with Minnesota Life's anti-money laundering policy.

35.     Shurwest, in addition to its contractual relationship with Securian Financial, also served as an IMO between Securian Financial and the brokers and agents within the Securian Financial Network.

36.     In its IMO role to agents and brokers, Shurwest promotes itself to insurance agents and others as follows:

PROPRIETARY SOLUTIONS

Shurwest gives you access to a complete array of insurance carriers offering the most advanced fixed indexed annuity and indexed universal life insurance strategies available

today. By choosing us as your partner, you also gain access to patented, limited-distribution solutions that set you apart from your competition.

EDUCATION AND TRAINING

Boost your confidence when consulting with clients through:

- webinars
- on-site visits to come meet our team
- personal coaching
- peer-to-peer idea sharing
- proprietary practice management system

To further keep you at the top of your game, we invite qualified advisors to Scottsdale to join in educational events featuring insights from top producers, breakthrough product positioning and advanced sales strategies.

http://shurwest.com/advisor-services/#proprietary-solutions last accessed April 10, 2020.

37.     Under its agreements with Securian Financial and Minnesota Life, Shurwest was authorized to recommend to Minnesota Life and Securian Financial "producers" (such as the Jarvis Defendants) who should be appointed to be their agents. Shurwest was also authorized under broker and agent agreements to "provide service" to "product owners" of Minnesota Life "products." The services Shurwest provided to "product owners" (i.e., the Plaintiffs and others) included premium finance products and services. As the IMO recruited by Minnesota Life to be its agent, Shurwest provided education, marketing, and distribution services to both agents and brokers in the Securian Financial Network and others. When insurance brokers and/or financial advisers who used Shurwest's services sold a Minnesota Life product, Minnesota Life paid a portion of the commissions to Shurwest pursuant to these agreements.

38.     Under the Master Brokerage General Agent ("MBGA") Agreements with Minnesota Life and Securian Financial, Shurwest contracted to perform "the following activities" (in relevant part):

1.2 . . .

(a) Supervise, insofar as possible, Your Brokers to ensure that they:
* * *
4. Comply with all applicable insurance laws and regulations governing the sales and servicing of our products
* * *
(b) Review all applications before submitting them to US . . . and submit only those applications that have been properly completed. . .

4.11   Anti-Money/Laundering:

You shall comply and require your brokers to comply with our anti-money laundering policy and if requested You and Your Brokers shall assist in satisfying Our obligations under our anti-money laundering policy.

39.      Shurwest also entered into Broker Sales Contracts with Minnesota Life and Securian which provided in part:

Section 3 ETHICAL STANDARDS
* * *
4.11 Anti-Money Laundering
You should comply with Our anti-money lending policy and if requested, you shall assist in satisfying our obligations under Our Anti-money Laundering policy.

40.      Shurwest, at all times acted within the scope of its authority under the agent and broker agreements referred to above with the actual or apparent authority of Minnesota Life and its actions relative to the FIP Products described herein were known or should have been known to Minnesota Life.

***The Jarvis Defendants***

41.      Edie Jarvis is a resident of the State of Florida, residing in Ormond Beach and is the owner of Jarvis Financial, Inc., also located in the same city.  Ms. Jarvis is licensed to sell life insurance by the State of Florida with FL Ins. Lic. No. A130379.

*42.*   As Minnesota's and Shurwest's agents, the Jarvis Defendants provided insurance and retirement planning advice to Plaintiffs within the State of Florida, involving the sale of Minnesota Life insurance products.

43.   As the principals for its agents, the Jarvis Defendants and Shurwest, Minnesota Life and Securian Financial are directly answerable for their agents' actions.

***Future Income Payments***

44.   Although not a party hereto, in that injunctive relief has been granted precluding the joinder of FIP in this action, FIP is a Delaware limited liability company, registered to do business in California, with an office located in Irvine, California. On information and belief, FIP specialized in issuing loans to pensioners in return for their pension payments and then bundled the loans and issued unregistered, non- exempt securities to investors backed by the pension payments. FIP was never registered with the SEC, FINRA or the State of Florida and engaged in the sales of securities which were required to be registered, but were not. Consequently, FIP engaged in the unlawful sale of securities to residents of the State of Florida, including Plaintiffs, which activities were aided and abetted by Defendants.

### III.   JURISDICTION AND VENUE

45.   This Court has subject matter jurisdiction over this case pursuant to 28 USC § 1331.

46.   Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in this District in that the relationships and conduct at issue in this case were entered into with and affected Plaintiffs-residents of this District.

47.   This Court has supplemental jurisdiction over the state law claims for relief under 28 USC §1367.

### IV. OPERATIVE FACTS REGARDING "THE LIFE
### INSURANCE RETIREMENT STRATEGY"
### a/k/a "THE FIP/IUL PACKAGE"

*Allegations as to the Jarvis Defendants*

48.    When Plaintiffs first contacted Ms. Jarvis in January 2017, they advised her that they were looking to generate retirement income with safety of principal and no stock market risk. To the extent possible, they wanted and needed guaranteed income regardless of the performance of the investment markets so that they could live the rest of their lives without fear of running out of money and, in addition, leave a legacy for their son Bradley.

49.    Plaintiffs shared with Ms. Jarvis the input they had previously received from other financial advisors, including the various products they were offering, and that Plaintiffs wanted to avoid any risks.  In response, Ms. Jarvis assured Plaintiffs that she would only recommend investments which met these criteria.  For example, in an email dated February 2, 2017, Ms. Jarvis stated, " . . . my most important job is to make sure my clients and their family are protected, educated and informed. I look forward to the opportunity of meeting and discussing your options again as well as helping you find ways to protect your family now and into the future."

50.    While on a trip to Scottsdale, Arizona for training-education very early in 2017, Ms. Jarvis called Plaintiffs and excitedly stated that she had found the "perfect package" for Plaintiffs' investments which would provide everything they needed and would perfectly fit their situation.  This "package" turned out to be the use of FIP investments in the form of structured cash flows sold by FIP to finance the premium payments required to purchase a Minnesota Life IUL (hereinafter referred to as the "Life Insurance Retirement Strategy" or the "FIP/IUL Package").  This strategy involved a procedure whereby Plaintiffs would pay a lump sum to FIP

to purchase monthly income streams that represented the total amount paid to FIP, plus a pre-determined rate of return, here 8% annually.

51.     According to Ms. Jarvis, in all her years of doing retirement planning, she had never seen anything as good as the Life Insurance Retirement Strategy. She claimed that the plan was totally safe and conservative and provided the best benefits of all the plans available.  She also indicated that the plan was so new that it still wasn't available in Florida but would be shortly. She further stated that the plan was a propriety product only available through the experts with whom she worked in Arizona, who, it turns out, were the members of the Shurwest Team described herein.  Upon information and belief, these representations were false and were negligently made.

52.     Upon her return to Florida, over the course of several weeks in the first quarter of 2017, both over the telephone and at Plaintiffs' residence, Ms. Jarvis described to Plaintiffs several aspects of the Life Insurance Retirement Strategy.

53.     Among other things, Ms. Jarvis represented that the "Structured Settlements" had the "full backing" of Minnesota Life.  Ms. Jarvis described the plan as consisting of pension payments, pledged by the pension owners, whose pensions would guarantee the re-payment for the up-front funds they received.  Ms. Jarvis also stated that the pension guarantees were all backed by the Federal Government Pension System and, since the U.S. government isn't ever going broke, safety of principal was assured.  Upon information and belief, these representations were false and were negligently made.

54.     Ms. Jarvis also claimed she was a certified expert in "Federal Benefits", one of the few in the State of Florida, and touted her "ChFEBC" designation as proof of her Federal Benefits expertise, making it sound as if it was the highest qualification available in financial planning.

55.     She presented her qualifications and designations ChFEBC and RIA ("Registered Investment Advisor") as those over and above a CFP Certified Financial Planner/Chartered Financial Planner due to her extended knowledge of Federal Benefits and included the RIA designation as one of her credentials in her correspondence with Plaintiffs.  In so far as neither of the Jarvis Defendants was an RIA, these representations were clearly false and negligently made.

56.     Ms. Jarvis also informed Plaintiffs that this Life Insurance Retirement Strategy had already achieved over 100 million dollars' worth of "new" business for the previous twelve months and that the plan had been in existence for years.

57.     Ms. Jarvis further informed Plaintiffs at the time that not one person in over ten years of FIP "Structured Settlements" had lost any monies, despite the fact that over 400 million dollars had already been invested in these products. Upon information and belief, these representations were false and were negligently made.

58.     Ms. Jarvis also specifically represented that Minnesota Life financially backed a "reserve account" that would pay for any contract should a pensioner ever fail in making payments. She further stated that Minnesota Life would not be involved with anything that's "risky" because people's retirements and life savings were at stake. In the event of pension payment defaults, Minnesota Life policies wouldn't be paid and Minnesota Life would never allow that to happen, explaining that Minnesota Life underwriting would never approve anything that would be considered unsuitable. She further claimed that Minnesota Life was "pushing" for this type of IUL insurance policies to be funded with "Structured Settlements" because of some complex rules requiring these policies to be paid for in a certain manner or risk being deemed modified endowments, with consequential negative tax implications.  Minnesota Life, according to Ms.

Jarvis, was the safest place the Zelinskis could place their investments. Upon information and belief, these representations were false and were negligently made.

59.     While the Zelinskis suggested that they use all their investment funds to pay the insurance policy premiums in full, Ms. Jarvis insisted that the structured settlement method was the only way to go and, in that way, a larger value life insurance product could be purchased.  Ms. Jarvis also explained to Plaintiffs that the insurance plan was structured in such a way as to maximize their income based on specific laws.  According to Ms. Jarvis, the policy payments had to be made over a specific time frame or it would be deemed a "Modified Endowment Contract" causing them to lose the benefits it was designed to deliver.  She also claimed it was a proprietary product only available through certain "elite" distributors. Upon information and belief, these representations were false and were negligently made.

60.     Ms. Jarvis also represented that the administrator contracted by FIP, Faw Casson, was designated to manage the accounting and collection of the "Structured Settlements" and would pursue the defaulting party and make up for any missed payments. Ms. Jarvis also represented that such defaults could only happen rarely due to the strict underwriting process required by FIP and Minnesota, which process insured that no more than 20% of any pensioner's monthly payment to be applied towards repayments. Upon information and belief, these representations were false and were negligently made.

61.     In the unlikely event of a default, according to Jarvis' representations, FIP and Faw Casson would then replace a defaulting contract with a new pension contract and take that defaulting contract over using legal action to make the defaulting party pay back the funds. According to Jarvis, Plaintiffs "would never lose a payment; it was all guaranteed" or words to

that effect.  Upon information and belief, these representations were false and were negligently made.

62.     In addition, in the unlikely event that a contract was ever deemed uncollectable, which Ms. Jarvis claimed had never happened in over 10 years, in addition to Minnesota Life's reserve account, FIP had reserve accounts set up as a fail-safe where the whole system could never fail.  Upon information and belief, these representations were false and were negligently made.

63.     According to Ms. Jarvis, each pensioner who participated in this program had to pledge proceeds from life insurance policy funds in the amount they owed to cover the debt in the event of their death. If they didn't have life insurance, then Minnesota Life would write a policy to cover them and the pensioner would have the balance of policy proceeds for their family once all payments were made on the pension loan.  Upon information and belief, these representations were false and were negligently made.

64.     In fact, this program, according to Ms. Jarvis, was so safe that she recommended to the Zelinskis that they obtain a mortgage against their house to make additional investments, while at the same time describing to the Zelinskis in great detail about her "fiduciary duty."

65.     At all times, Ms. Jarvis claimed that these investments, coupled with the purchase of the Policy, were completely safe and a "no brainer**."** Upon information and belief, these representations were false and were negligently made.

66.     In addition, Ms. Jarvis represented to Plaintiffs that the IUL policy included a "guarantee" of lifetime benefits, a representation which was false and negligently made, in that the guarantees provided by the contract expired at the time Mrs. Zelinski reached the age of 70.

67.     Plaintiffs relied upon the representations contained in paragraphs 45-66 above and would not have agreed to the Life Insurance Retirement Strategy or to purchase the FIP securities had they known that said representations were false.

68.     These discussions culminated in a recommendation by the Jarvis Defendants, individually and as agents for Shurwest and Minnesota Life, in April 2017, that Plaintiffs George and Janice Zelinski purchase the Policy on the life of Plaintiff Janice Zelinski, providing coverage in the amount of $4,300,000 with an annual premium of $205,000, which, when fully funded, would provide a death benefit and would have an accumulated value that would allow Mr. and Mrs. Zelinski to supplement their retirement income by borrowing against the Policy for the balance of their retirement years, thereby implementing the Life Insurance Retirement Strategy.

69.     In addition, in order to qualify for the Minnesota Life IUL policy, according to Ms. Jarvis, Plaintiffs needed to demonstrate that they had sufficient annual income (which they currently did not) to meet underwriting guidelines.  In order to do that, Jarvis stated that they should invest $1,500,000 in April 2017 in the FIP program and that would establish sufficient income to meet Minnesota Life's suitability requirements.  Indeed, on the very same day as Mr. and Mrs. Zelinski wrote a check to Faw Casson in that amount, Jarvis assisted the Zelinskis in completing a Minnesota Life IUL application showing unearned income in the amount of $214,356, the amount of projected income from the $1,500,000 April 2017 investment.

70.     Also based upon Ms. Jarvis' directions, Mr. and Mrs. Zelinski established a new account with Sun Coast Credit Union for the sole purpose of receiving FIP payments and automatically transferring those payments to Minnesota Life to fund the premiums due on the Policy sold to them by the Jarvis Defendants.  Thereafter, all deposits made into the Sun Coast

account were automatically withdrawn by Minnesota Life to fund those premiums until FIP ceased making payments in April 2018.

71.     Pursuant to the Life Insurance Retirement Strategy as described to Plaintiffs by the Jarvis Defendants, those payments received from FIP were to be directed to Minnesota Life to pay for the Policy annual premiums.

72.     The Jarvis Defendants recommended the Life Insurance Retirement Strategy to Plaintiffs despite the fact that they failed to conduct adequate due diligence regarding FIP and that their recommendation to purchase the FIP securities to fund the IUL Policy was in negligent disregard of the numerous risks associated with the FIP cash flow transactions. As the regulatory actions against FIP make clear, the FIP cash flow product was inherently flawed and subject to serious risks that should have prevented the recommendation that Plaintiffs use it to fund the purchase of the Policy or otherwise invest in FIP.

73.     The Jarvis Defendants either knew or should have known that the FIP investments were so risky as to not warrant their use as part of the Life Insurance Retirement Strategy. In addition to the issues raised in the various regulatory actions, numerous other risks made these FIP transactions wholly inappropriate for use in the Life Insurance Retirement Strategy. The Jarvis Defendants violated their duties to the Plaintiffs by recommending that they use FIP cash flows to fund their purchase of the Policy and for other retirement purposes.

74.     At all relevant times, the Jarvis Defendants were authorized and appointed Minnesota and Shurwest agents, authorized to transact Minnesota Life and Shurwest business in the State of Florida.

75.     Despite not being licensed to sell securities, at the recommendation of Shurwest, the Jarvis Defendants entered into a "Producer Marketing Agreement" with FIP in which the Jarvis

Defendants agreed to locate clients who might be interested in purchasing income streams from FIP and to introduce such clients to FIP in return for a fee to be paid to the Jarvis Defendants in the event the clients purchased FIP investments.

76.     Under the terms of said FIP agreement, the Jarvis Defendants were required to disclose to the client the fact that they would be receiving a fee from FIP.  Despite that fact, Plaintiffs were never advised of the fee by anyone.

77.     For her sale of the FIP investments to Plaintiffs, Jarvis received a commission, believed to be in the amount of $123,267.52, directly from FIP.  Upon information and belief, additional commissions of well over $1 million, were paid by FIP to the Shurwest Team, described below, for the FIP sales to Plaintiffs, as well as others.

***Allegations Against Shurwest***

78.     Using typical Securian marketing materials, Shurwest marketed the FIP securities to Minnesota Life brokers, such as the Jarvis Defendants, at conferences, webinars and face-to-face meetings as a method for financing the premiums of life insurance policies issued by Minnesota Life.

79.     In its capacity as Minnesota Life's agent and/or broker, Shurwest marketed FIP securities as one of many investment products available for Minnesota Life agents and/or brokers to sell to insurance customers such as Plaintiffs.

80.     At Shurwest, the team involved in designing and promoting the Life Insurance Retirement Strategy included Melanie Schultz-Miller ("Miller"), Nick Johnson ("Johnson"), Michael Seabolt ("Seabolt") and possibly others.[1]  Hereinafter, this group is referred to as the

---

[1] On July 31, 2015, Seabolt was barred by the Securities Exchange Commission from working in any capacity in the securities industry.  Despite that fact, Shurwest hired Seabolt as a "Strategic Life Consultant" and promoted him to the position of National Sales Director when it terminated Miller in 2018.

"Shurwest Team."  Miller, who was employed by Shurwest from June 2012 to May 2018 and previously worked at Minnesota Life, worked as Shurwest's National Life Insurance Sales Director at all relevant times.  Jarvis directly communicated with Miller and Seabolt regarding Plaintiffs' FIP investments and the Life Insurance Retirement Strategy recommended to Plaintiffs.

81.    When Jarvis was invited to Shurwest's headquarters in Arizona and traveled from Florida for that purpose, Ms. Jarvis met with Miller, Seabolt and others at Shurwest who touted FIP as an excellent means to finance IUL premiums needed to purchase and maintain life insurance policies issued by companies such as Minnesota Life.

82.    The Shurwest Team presented to Jarvis a detailed program designed to introduce insurance agents to the FIP product and its use in financing IUL premiums, specifically the FIP/IUL Package. Special guest speakers at conferences sponsored by Shurwest included Wade Allen, Advanced Marketing Consultant for the Securian Financial Group, whose topic was noted as "Premium Finance," and David McCoy, Senior Life Product Research Specialist for the Securian Financial Group.

83.    At the meetings and conferences it sponsored, Shurwest promoted FIP products to financial advisors, insurance agents and brokers. These agents were further directed by the Shurwest Team to arrange for Plaintiffs and others to pay a lump sum to FIP to obtain the stream of structured cash flows it was offering, which – in turn – would be used to purchase the life insurance policies.

84.    Upon information and belief, Shurwest paid for the traveling expenses of life insurance agents, such as Ms. Jarvis, to attend such programs.

85. The Shurwest Team recommended and facilitated the use of the FIP products as premium financing vehicles as safe and reliable products that would provide a consistent stream of income that would fund the payment of Minnesota Life insurance policies.

86. Plaintiffs were aware that Ms. Jarvis had learned of the FIP/IUL Package from Shurwest and was put in contact with Shurwest personnel when questions arose.

87. Specifically with respect to Plaintiffs, on February 21, 2017, Seabolt emailed Ms. Jarvis regarding Shurwest's "Structured Cash Flows" ("SCF") in connection with Plaintiffs' interest in a life insurance program, advising Jarvis that "the SCF funding pays you 4% on top of that, so that (sic) another 100K . . . not too bad."

88. Additionally, Seabolt introduced Ms. Jarvis to Joe Hipp of FIP in or around April 2017 and, on April 13, 2017, forwarded to Ms. Jarvis an FIP Note for Plaintiffs' use in connection with their first purchase of FIP investments.

89. The following day, April 14, 2017, Seabolt directed Ms. Jarvis to send him Plaintiffs' FIP and life insurance applications so he could "scrub" them and directed Jarvis to forward to him Plaintiff's initial check to Minnesota Life and to send another check to purchase FIP securities to Faw Casson.

90. As another example, on May 12, 2017, via email, Seabolt described to Ms. Jarvis the FIP/IUL Package by stating, "They match our 'purchase' of cash flows with the government pension holders that 'sell' part of their guaranteed pension income.  When we close a deal, we will get closing books that identifies the exact source of our income stream.  We will get full transparency into the sellers including a letter from the entity paying the pension.  So we are 'match' with the sellers.  Very cool."

91.    To make matters even more clear, on May 31, 2017, Seabolt wrote Ms. Jarvis, via email, informing Ms. Jarvis that he had spoken with FIP about Plaintiff Brad Zelinski's FIP investment and, with respect to the FIP investments to fund the IUL Policy, "he had her (FIP's representative) split this into 3, $500k segments to move it forward quicker."

92.    Consequently, Seabolt, acting in his capacity as Shurwest's Strategic Life Consultant, was instrumental in the sale of the FIP investments.

93.    All of the above-referenced Seabolt emails were sent by Seabolt from his Shurwest authorized email address.

94.    Shurwest recommended the FIP/IUL Package to Jarvis and Plaintiffs as being appropriate and suitable for Plaintiffs' financial and retirement needs.

95.    Shurwest communicated with and directed the Jarvis Defendants in effectuating the sale of the FIP/IUL Package to Plaintiffs, processed Plaintiff's IUL application and submitted it to Minnesota Life and accepted, and transferred to Minnesota Life, Plaintiffs' initial premium payment for the IUL Policy.

96.    Shurwest had actual and constructive knowledge of the illegality of the FIP loan program. Indeed, members of the Shurwest Team represented to the Jarvis Defendants that Shurwest had vetted the FIP products, and it was also responsible for structuring the FIP products and facilitating the use of the FIP/IUL Package.

97.    The brokers who were involved in the FIP sales process, such as the Jarvis Defendants, were assured by Shurwest Team members that FIP Products were appropriate for the insureds who were purchasing IUL products from Minnesota Life.

98.    Shurwest had direct knowledge of the significant problems with FIP in August, 2017 if not earlier.

99.     As early as August 2017, prior to Minnesota Life's acceptance of Plaintiff's IUL application, Shurwest Team members were informed of regulatory proceedings against FIP which were described as "more than alarming."

100.    On August 28, 2017, Shurwest employees Melanie Schulze-Miller, Kyle Pesch and Jim Maschek (Shurwest's Vice-President of Sales and an equity partner) received an email from a Shurwest agent with the subject line "Important" that contained references and links to state lawsuits against FIP and which email asked those employees if they were aware of those issues with FIP.

101.    Ms. Schulze-Miller responded on the same day, stating that she was "very familiar with FIP" and that the complaints were "actually on the investor end" and that there was a "zero default rate".

102.    Ms. Schulze-Miller then suggested that there were negative remarks or lawsuits for IUL all the time and to be wary of what the agent sees on the internet. She offered to help the agent connect him with someone who can provide better information, Joe Hipp (the same individual that Seabolt also introduced to Ms. Jarvis), who she described as a wholesaler for FIP that she has known for a long time.

103.    Nevertheless, Shurwest never alerted Plaintiffs to these concerns.

104.    The Shurwest Team members conducting these meetings and otherwise pitching FIP products in conjunction with the sale of Minnesota Life's life insurance policies, were at all times acting within the scope of their employment with Shurwest, with the actual or apparent authority of Shurwest, and their actions relative to the FIP products were known or should have been known to Shurwest.

105.    While Shurwest will claim in its defense that its personnel comprising the Shurwest Team were acting beyond the scope of their employment with Shurwest, the evidence will show to the contrary.

106.    Specifically, documentary evidence in the form of at least hundreds of emails will demonstrate that more than thirty (30) Shurwest employees were openly communicating about using and promoting FIP as an insurance premium funding mechanism for customers of Shurwest and its agents. Such documentary evidence, as explained above, includes specific communications between Ms. Jarvis and Seabolt regarding Plaintiffs' investments in FIP, Seabolt's introduction of Ms. Jarvis to Joe Hipp of FIP, and the use of the FIP investments to fund the IUL premiums.

107.    Additionally, evidence will show that Shurwest was involved in promoting FIP investments in the amount of approximately $245 million all told throughout the United States, including Plaintiffs' FIP investments, in order to fund the premiums paid to secure life insurance policies issued by Minnesota Life.

108.    While Shurwest will undoubtedly claim that it never received any direct commission from FIP, it is undeniable that the Shurwest Team members did receive such commissions and that Shurwest was paid sizable commissions by Minnesota Life by reason of Shurwest's sales of Minnesota Life insurance policies funded or to be funded by income streams purchased from FIP.

109.    Shurwest's direct involvement with the FIP fraud has been acknowledged by the court-appointed Receiver in the FIP/Scott Kohn proceeding pending in the US District Court of South Carolina, in which the Received has sued the Jarvis Defendants (*Beattie B. Ashmore, as Court-Appointed Receiver v. Edie Jarvis and Jarvis Financial, Inc.*, 6:19-cv-01112-BHH), and

has represented to that Court that, "Shurwest, LLC was integrally involved in the underlying Ponzi scheme."

110.    Additionally, Shurwest has argued in the Superior Court of California, County of Marin case of *Geoffrey v. Brown, et al.*, Case No: CV1900627 that Ms. Schulze-Miller and other Shurwest Team members were "rogue employees".  However, that Court has declared, by order dated June 24, 2020, that to suggest that the Shurwest Team members "were rogue employees operating without Shurwest's knowledge or sanction is simply ***not credible*** in light of the overwhelming evidence that Shurwest was aware of the use of FIP to fund higher levels of IUL, that its employees did so as part of their employment with Shurwest . . . and that Shurwest ultimately profited off those increased IUL amounts via commission". (Emphasis supplied).

*Allegations against Minnesota Life*

111.    Under its own practices and policies, Minnesota Life allowed only brokers under contract with Minnesota Life to market and offer IUL products to insureds, such as Plaintiffs.

112.    As described in greater detail *infra*, Minnesota Life was aware that Plaintiffs had been sold the FIP securities prior to approving the issuance of the IUL Policy.

113.    Furthermore, Minnesota Life knew or should have known of FIP's illegal loan scheme by the presence of its high-ranking employees at Shurwest events promoting the FIP/IUL Package as a means of funding life insurance premiums, as well as through reports of actions by state regulatory agencies' enforcement actions against FIP and its convicted felon founder Scott Kohn.

114.    In addition, Minnesota Life's presence at and participation in, webinars and conferences wherein Minnesota Life representatives spoke about premium financing vehicles

and advantages where FIP products were being promoted conveyed Minnesota Life's implied grant of authority to Shurwest to promote FIP products as a premium financing vehicle for IUL policies offered by Minnesota Life.

115.    Minnesota Life, as an insurance company selling permanent life insurance, is subject to the federal Bank Secrecy Act ("BSA") and its implementing regulations (Anti-Money Laundering ("AML") rules).

116.    Pursuant to AML rules codified at 31 C.F.R. § 1025.320(a)(2)(iii), Minnesota Life has a duty to report any transaction that "is conducted or attempted by, at, or through an insurance company, and involves or aggregates at least $5,000 in funds or other assets, and the insurance company knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):…Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the insurance company knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction[.]"

117.    If Minnesota Life had performed its statutorily required duties, it would have uncovered facts showing that the permanent life insurance policy recommended to Plaintiffs was improper.

118.    Minnesota Life should have determined that, per 31 C.F.R. § 1025.320(a)(2)(iii), the transactions "ha[d] no business or apparent lawful purpose or [were] not the sort in which the particular customer would normally be expected to engage." Plaintiffs were retirees living on a limited fixed income who needed their retirement savings for immediate use. Plaintiffs' initial partial premium payment for the Policy was approximately $205,000—well in excess of the $5,000 threshold from AML rules.

119.    Further, the Minnesota Life policy called for continued annual premiums of approximately $200,000.   An investigation by Minnesota Life would have uncovered the fact that the only reason Plaintiffs believed they could "afford" the Policy was the negligent misrepresentation that concentrating the remainder of their life savings in a single, unregistered security (i.e., FIP) would provide them with sufficient distributions to cover the policy premiums. Minnesota Life should have determined that such a concentrated investment was an unacceptable risk for individuals such as Plaintiffs.

120.    As such, either Minnesota knew of and approved its agents' actions, or it ratified its agents' actions by negligently or recklessly performing its duties.

121.    Finally, Minnesota Life had ample opportunity and ability to bar its agents and brokers in the Securian Financial Network from using the FIP illegal loan scheme to finance life insurance policy purchases by Plaintiffs, especially since Minnesota Life prohibited the use of structured cash flows in connection with the sale of its insurance products, a policy it failed to enforce in this case, despite being aware of its use.

122.    According to published reports, approximately 370 financial advisors nationwide put their clients in FIP securities and steered those clients to utilize the FIP monthly payments to fund insurance products, such as Minnesota Life's IUL policies.

***Plaintiffs' Purchases and the Collapse of FIP***

123.    Based upon Jarvis' directions, and the instructions Jarvis received from the Shurwest Team, Mr. and Mrs. Zelinski wrote the following checks: a) in the amount of $1,500,000 dated April 13, 2017 to fund three $500,000 purchases of FIP structured cash flow contracts; b) in the amount of $790,000 dated September 7, 2017 to fund another purchase of an FIP structured cash flow contract; c) a check in the amount of $300,000 dated April 26, 2017 from Brad Zelinski

to fund the purchase of an FIP structured cash flow contract; and d) a check to Minnesota Life in the amount of $85,000 on September 7, 2017.  All told, Plaintiffs invested $2,675,000 in FIP contracts based upon the above referenced representations in order to purchase the Policy and to meet underwriting requirements therefore.

124.    According to the FIP purchase agreements, Plaintiffs George and Janice Zelinski would receive monthly principal and interest payments of $17,863.68 for ten years until their initial principal investment of $1,500,000 was repaid plus 8% interest. In addition, they would receive $15,811.28 per month into their Sun Coast Credit Union account (discussed below) to fund the annual premium payments to Minnesota Life.

125.    Plaintiffs George and Janice Zelinski depended on the money invested in FIP securities to cover their immediate living expenses in retirement and to fund the purchase and ongoing costs of the Policy.

126.    According to the FIP purchase agreement, Plaintiff Brad Zelinski would receive monthly principal and interest payments of $3,572.74 for ten years until his initial principal investment of $300,000 was paid plus 8% interest.  However, Mr. Zelinski only received payments until on or about April 2018.

127.    Brad Zelinski only agreed to purchase the FIP investments because that is the way his parents were going to finance the purchase of the Policy.  In the absence of Defendants' recommendations to his parents, Brad Zelinski would never have invested in FIP.

128.    After making the March 2018 payments, in or about April 2018, FIP ceased making payments to income stream purchasers, including Plaintiffs. As a result, Plaintiffs could no longer fund the IUL Policy. Consequently, Plaintiffs suffered the potential lapse of the Policy, faced surrender charges and other penalties, and have paid for a Policy which never

accumulated enough value to provide the Plaintiffs with a source of retirement income, the objective of the life insurance policy purchase. At the same time, Plaintiffs lost whatever they had paid to FIP, which was supposed to – but did not – yield a steady stream of cash flows that would have funded the Policy.

129.    On or about April 10, 2018, FIP sent some investors and other interested parties, not including Plaintiffs, a letter with re line "FIP Restructure" stating that "Due to [FIP's] business and legal expenses, FIP plans are [sic] to restructure its operation and to drastically cut its overhead."

130.    Around the same time that FIP claimed it was "restructuring" it circulated an undated letter stating that: "There will be NO restructuring or collections by FIP in ANY state**."** (Emphasis removed.) Further, "FIP's final and ONLY remaining task is to provide Buyers the information they need on the assets they purchased."

131.    At all material times herein mentioned, each Defendant was the agent, principal, servant, representative, employer, employee, joint venturer, co-conspirator, partner, parent, subsidiary, affiliate and/or alter ego of each and every other Defendant and, in doing the things hereinafter alleged, was acting within the course and/or scope of such authority as the agent, principal, servant, representative, employer, employee, joint venturer, co- conspirator, partner (of any kind), parent, subsidiary, affiliate, and/or alter ego with the authority and consent of the remaining co-Defendants except where otherwise specifically described.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
AGAINST ALL DEFENDANTS

### VIOLATION OF THE FEDERAL SECURITIES ACT OF 1933

132.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

133.   Sections 5, 11, and 12 of the Federal Securities Act of 1933 (the "Securities Act") provide registration and other requirements relating to the FIP securities offered to Plaintiffs.

134.   On information and belief, the FIP securities that were offered and sold to Plaintiffs were not registered in compliance with the Securities Act.

135.   The FIP sale to Plaintiffs was in violation of the Securities Act in that there was no registration in effect regarding the FIP securities and no exemption from registration which applied.

136.   The Jarvis and Shurwest Defendants marketed and recommended FIP's securities without an offering memorandum prior to Plaintiffs making their investment, and they did not certify Plaintiffs' accreditation status or take other necessary steps to comply with Federal and State securities laws.

137.   The Jarvis Defendants and Shurwest, each having recommended the purchase of the FIP securities to Plaintiffs, were sellers of the FIP securities purchased by Plaintiffs.

138.   Shurwest is a "controlling person" of the Jarvis Defendants as that term is defined under 15 U.S. Code § 77o.

139.   Minnesota Life is a "controlling person" of the Jarvis Defendants and Shurwest as that term is defined under 15 U.S. Code § 77o.

30

140.    At all relevant times, the Jarvis Defendants were acting as the agents of Minnesota Life and Shurwest and acting within the scope of their authority or with apparent authority as such agents at the time the Jarvis Defendants and Shurwest sold the FIP securities to Plaintiffs.

141.    Further, none of the Defendants were properly registered, licensed, or certificated to engage in the securities transactions as alleged in this Second Amended Complaint, nor were they exempt.

142.    Defendants, and each of them, also failed to disclose required information to Plaintiffs as alleged herein, including but not limited to, failing to provide Plaintiffs with a prospectus or offering memorandum for their FIP securities and insuring that Plaintiffs were accredited investors for purpose of the Securities Act.

143.    This cause of action is a statutory strict liability cause of action which does not require proof of causation or intent.

144.    Accordingly, the Jarvis Defendants are liable for their sale to Plaintiffs of unregistered FIP securities, Shurwest is liable as seller of the FIP investments and as a control person of the Jarvis Defendants and under principles of respondeat superior and Defendant Minnesota Life is liable under principles of respondeat superior and as a control person of both Shurwest and the Jarvis Defendants

145.    Plaintiffs are entitled to rescission of all transactions and/or damages and prejudgment interest and attorneys' fees and costs from all Defendants.

## SECOND CLAIM FOR RELIEF
AGAINST ALL DEFENDANTS

## BREACH OF CONTRACT

146.    Plaintiffs incorporate by reference paragraphs 1 through 131 as though fully set forth herein.

147.    Plaintiffs and Defendants entered into a contract whereby, in exchange for Plaintiffs' investment of $2,675,000 in FIP securities, Defendants would provide a Minnesota Life IUL policy providing insurance coverage to Plaintiffs on the life of Janice Zelinski in the amount of $4,300,000 on the life of Janice Zelinski.

148.    Plaintiffs agreed to purchase FIP securities through the Jarvis Defendants and Shurwest, who again were acting as agents for Minnesota Life.

149.    Plaintiffs agreed to purchase the IUL Policy through the Jarvis Defendants and Shurwest, who, again, were acting as agents for Minnesota Life.

150.    The Jarvis Defendants and Shurwest knew, as it was based on their recommendation, that Plaintiffs intended to use the payments from the FIP securities to pay the premiums on that life insurance policy.

151.    Plaintiffs fulfilled all of the requirements imposed upon them as the insured of IUL Policy and the purchaser of the FIP products.

152.    By virtue of the collapse of FIP and the failure of that investment to generate revenues to fund the payment of premiums due to be paid under the Policy, Defendants have failed and refused to provide Plaintiffs with the benefit of the bargain.

153.    By reason of the foregoing, Defendants are in breach of contract and are liable to provide the benefits to which the parties agreed.

## THIRD CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS

### BREACH OF FIDUCIARY DUTY

154.    Plaintiffs incorporate by reference paragraphs 1 through 131 as though fully set forth herein.

155.    A fiduciary or confidential relationship existed between Plaintiffs and each Defendant.

156.    The Jarvis Defendants and Shurwest owed fiduciary duties to Plaintiffs by holding themselves out as brokers and financial advisers, investment advisers and skilled financial and licensed professionals with authority to effect transactions in securities and investments, such as the FIP securities and the IUL Policy.

157.    Shurwest and the Jarvis Defendants had actual or apparent authority from their principals, Minnesota Life and Shurwest, to do the same on behalf of Minnesota Life.

158.    Accordingly, all Defendants owed fiduciary duties to Plaintiffs.

159.    Further, Defendants owed Plaintiffs fiduciary duties as common law agents entrusted with Plaintiffs' life savings.

160.    Plaintiffs were vulnerable to the Jarvis Defendants' and Shurwest'ssales techniques and promises and they relied on their representations of financial and investment expertise and recommendations. Plaintiffs followed the Jarvis Defendants' and Shurwest's recommendations and advice to invest in the FIP securities for the purpose of purchasing and funding the Policy.

161.    The Jarvis Defendants betrayed the trust that Plaintiffs reposed in them and breached their fiduciary duties by: (1) engaging in all acts discussed herein including the registration/licensing violations; (2) putting their interests ahead of Plaintiffs' interests and taking

actions and making recommendations for their own gain at Plaintiffs' expense; (3) concealing material facts from Plaintiffs and by misleading them and deceiving them in all the acts discussed herein. Minnesota Life and Shurwest are liable for the same as principals of the Jarvis Defendants.

162.   As alleged in the Complaint filed by the Receiver, the Jarvis Defendants knew of the inappropriateness of FIP products because they were among the agents who received *undisclosed* commissions of 5-11% "paid at the expense of hard-working individuals that were deceived" such as Plaintiffs here.  As further set forth in said Complaint, the Jarvis Defendants were paid $123,267.52 by FIP for selling the FIP investments to Plaintiffs.

163.   Minnesota Life and Shurwest are liable for the same as principals of the Jarvis Defendants and by reason of their duty to supervise the Jarvis Defendants.

164.   Minnesota Life is also liable for breach of fiduciary duty because, as discussed above, it learned in the underwriting process that Plaintiffs would be funding the IUL using FIP payments.

165.   Minnesota Life should have declined the IUL application because FIP is a structured cash flow product which Minnesota Life's Policies and Procedures prohibit from use as a vehicle to pay insurance premiums.

166.   However, Minnesota Life approved the policy anyway.

167.   Defendants' breaches of fiduciary duty proximately caused Plaintiffs' harm.

## FOURTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS

### NEGLIGENT MISREPRESENTATIONS AND OMISSIONS

168.    Plaintiffs incorporate by reference paragraphs 1 through 131 as though fully set forth herein.

169.    Under Florida law, a negligent misrepresentation occurs when there is a misrepresentation of material fact, the representor knew or should have known the truth or falsity of the representation, intent by the representor to induce another to act on it, and an injury as a result of justifiable reliance on the misrepresentation.

170.    As alleged above, the Jarvis Defendants and Shurwest made affirmative misrepresentations to, and negligently concealed material information from, Plaintiffs all as set forth in Paragraphs 50 through 66 above.

171.    For example, the Jarvis Defendants and Shurwest concealed from Plaintiffs their lack of registration, certification and licensure as set forth herein needed to sell investments, such as the FIP securities, to Plaintiffs. The Jarvis Defendants held themselves out as a registered investment advisers. However, none of them were registered, licensed, or certificated to act as such and they never disclosed this to Plaintiffs.

172.    Shurwest is liable for these for these negligent misrepresentations and omissions directly as well as under the doctrine of respondeat superior, since the Jarvis Defendants acted as its agents.

173.    Minnesota Life is liable for these negligent misrepresentations and omissions under the doctrine of respondeat superior, since the Jarvis Defendants acted as its agents.

174.    Minnesota Life also committed negligent misrepresentations by identifying Jarvis as an "advisor" when in fact she was not registered, licensed, or certificated as a financial/investment advisor.

175.    The Jarvis and Shurwest Defendants also negligently concealed the fact that the FIP securities were not properly registered or exempt from registration.

176.    The Jarvis and Shurwest Defendants also negligently concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

177.    Minnesota Life is liable for Shurwest's negligent misrepresentations and omissions under the doctrine of respondeat superior in that Shurwest acted as Minnesota Life's agent at all relevant times.

178.    Minnesota Life is liable for Shurwest's negligent misrepresentations and omissions under the doctrine of respondeat superior in that the Jarvis Defendants acted as Minnesota Life's agents at all relevant times.

179.    Each of Defendants knew or reasonably should have known that their conduct was wrongful and negligent.

180.    Even if the Jarvis Defendants and Shurwest honestly believed that their representations were true or that they had no duty to disclose information that they failed to disclose to Plaintiffs, Shurwest and the Jarvis Defendants had no reasonable grounds for their belief at the time of their misrepresentation or omissions.

181.    The Jarvis Defendants and Shurwest intended for Plaintiffs to rely on their misrepresentations and omissions.

182.    Plaintiffs relied on and were justified in relying on Shurwest's and the Jarvis Defendants' misstatements.

183.     Defendants' negligent omissions and misrepresentations proximately caused Plaintiffs' harm.

### FIFTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS

### NEGLIGENCE

184.     Plaintiffs incorporate by reference paragraphs 1 through 131 as though fully set forth herein.

185.     Each of Defendants knew or should have known that recommending to Plaintiffs that they utilize their life savings to purchase concentrated, speculative, unregistered investments violates the law and is actionable and is negligent.

186.      Each of Defendants knew or should have known that FIP was at risk of financial ruin due to ongoing legal and regulatory issues, but none of the Defendants informed and warned the Plaintiffs of these risks.

187.     Defendant Minnesota Life was negligent by failing to monitor and supervise the Jarvis Defendants' and Shurwest's conduct in the sale of FIP securities and the IUL Policy to Plaintiffs.

188.     Minnesota Life failed to adequately investigate or otherwise supervise its personnel, Shurwest and the Jarvis Defendants in such a fashion that would have prevented the FIP sale to Plaintiffs.

189.     Minnesota Life knew or should have known that its agents, including the Jarvis Defendants and Shurwest, were selling FIP because during the underwriting process, it was disclosed to Minnesota Life that Plaintiffs had invested in FIP and were using the income from their FIP investments to fund the annual premiums due under the IUL Policy.

190.    Similarly, Minnesota Life became aware during the underwriting process for the IUL Policy that Plaintiffs had invested in FIP and were using a prohibited Structure Cash Flow investment to fund the annual premiums for that Policy.

191.    On July 13, 2017, Minnesota Life's underwriter, Andrew McCurdy (the "ML Underwriter") questioned whether the financial documentation submitted in support of the issuance of Policy did not contain enough information to support the application and inquired about the financial supplement to the application in which Mrs. Zelinski listed $2.98 million in cash.

192.    In response, Minnesota Life and the ML Underwriter were provided brokerage statements and a letter from FIP most likely by either Jarvis or Shurwest or both. The ML Underwriter then began asking questions about FIP on August 14, 2017.

193.    On August 16, 2017, the ML Underwriter received a response that FIP was a structured settlement note, at which time the ML Underwriter again requested more details.

194.    On August 23, 2017, the ML Underwriter was informed that FIP was "not a structured settlement" but a "structured cash flow" that would produce a fixed rate of return.

195.    On August 28, 2017, the ML Underwriter was informed that the Zelinskis had made a lump sum payment from their Fidelity investment account and that FIP would "[pay] them back a 17863.22 a month for the next 10 years (2.143m total)" and that the FIP investments were included in the Zelinski's net worth.

196.    Just two days later, Minnesota Life and the MN Underwriter approved the IUL Policy application submitted by Jarvis and Shurwest on behalf of Plaintiffs.

197.    This approval was in violation of Minnesota Life's own Policies and Procedures on Life insurance and Annuity Sales.

198.     In Section K. Policy Against Certain Sales Concepts, Minnesota Life, Minnesota Life prohibits:

> Sales of life products when a strategy involves structured cash flows is involved. This sales strategy encourages the prospective policyowner to lend money to an individual or individuals in return for the promise that the borrower repay the loaned funds with pension, IRA or other sources of structured income.   The individuals lending in these transactions would then use the income stream resulting from the loan payments as premiums into a cash value life insurance policy.  ***Sales involving this type of strategy are not permitted with the Companies' products.*** (Emphasis supplied).

199.     Minnesota Life, as an insurance company selling permanent life insurance, is subject to federal BSA and AML rules.

200.     Further, pursuant to AML rules codified at 31 C.F.R.  § 1025.320(a)(2)(iii), Minnesota Life should have determined that the transactions "ha[d] no business or apparent lawful purpose or [were] not the sort in which the particular customer would normally be expected to engage."  Its failure to do so was negligent.

201.     Plaintiffs were retirees living on a limited fixed income who needed their retirement savings for immediate use. Plaintiffs' initial partial premium payment for the Policy was approximately $205,000—well in excess of the $5,000 threshold triggering AML rules.

202.     Even a cursory investigation of FIP by Minnesota Life would have would have uncovered the fact that the only reason Plaintiffs believed they could "afford" the Policy was the negligent misrepresentation that concentrating the remainder of their life savings in a single, unregistered security (i.e., FIP) would provide them with sufficient distributions to cover the policy premiums. Minnesota Life should have, but negligently failed to, determine that such a concentrated investment was an unacceptable risk for individuals such as Plaintiffs.

203.    If Minnesota Life had non-negligently performed its statutorily required duties, it would have uncovered facts showing that the permanent life insurance policy recommended to Plaintiffs was improper.

204.    For its part, Shurwest was negligent in connection with the sale of the FIP/IUL Package to Plaintiffs in that Shurwest knew or should have known its agents, including the Jarvis Defendants, as well as its own employees, were utilizing an improper structured cash flow product, FIP, to sell to customers in an effort to increase the volume of IUL policy sales which were unsuitable for its customers and in violation of Minnesota Life's rules prohibiting the use of structured cash flows.

205.    Shurwest negligently failed to properly supervise its employees and negligently failed to properly supervise its brokers, such as the Jarvis Defendants, in violation of its duties as Master Broker with Minnesota Life and by negligently failing to properly review all insurance applications before submitting them to Minnesota Life to insure they were properly completed

206.    Shurwest was required to supervise the conduct of its employees and the Jarvis Defendants and failed to do so in a non-negligent manner.

207.    For their part, the Jarvis Defendants were negligent by reason of their carelessness in recommending the Life Insurance Retirement Strategy to Plaintiffs without having done sufficient due diligence and by relying on the false representations by Shurwest that the use of the FIP/IUL Package as a means to secure Plaintiffs financial future was suitable.  It was not.

208.    The Jarvis Defendants could have, but failed to properly investigate FIP, the prohibited use of Structured Cash Flows by Minnesota Life, and the validity of the representations made to them by Shurwest regarding the safety of the FIP/IUL Package.

209.    As a result of the foregoing negligence by each of the Defendants, they are each liable to Plaintiffs in negligence for the ensuing damages.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**

**PROFESSIONAL NEGLIGENCE**

</div>

210.    Plaintiffs incorporate by reference paragraphs 1 through 131 and 185 through 208 as though fully set forth herein.

211.    Professional negligence exists when a professional's actions do not meet the accepted standards within the professional's industry or business.

212.    Defendants each had a duty to perform their services exercising due care and skill reasonably to be expected of a person who engages in the business in which Defendants were occupied, the issuance and sale of life insurance products.

213.    Defendants negligently breached these duties as heretofore alleged in this Second Amended Complaint.

214.    Shurwest breached these duties by negligently failing to properly supervise its employees and by negligently supervising brokers such as the Jarvis Defendants in violation of its duties as Master Broker with Minnesota Life and by negligently failing to properly review all insurance applications before submitting them to Minnesota Life to insure they were properly completed.

215.    The Jarvis Defendants negligently breached these duties by negligently recommending the purchase of the IUL policy sold to Mrs. Zelinski and the misrepresentation that the benefits to be conferred under the terms of that policy were guaranteed for the life of Mrs. Zelinski.

216.   Minnesota Life was aware of Plaintiffs' FIP investments during its negligently conducted underwriting process in connection with Plaintiffs' IUL policy application.

217.   Minnesota Life learned in the underwriting process that Plaintiffs would be funding the Policy using FIP payments.

218.   Minnesota Life should have declined the IUL application because FIP is a structured cash flow product which Minnesota Life's Policies and Procedures prohibit from use as a vehicle to pay insurance premiums.

219.   Minnesota Life negligently approved the IUL application anyway and never informed Plaintiffs that Structured Cash Flows are prohibited by Minnesota Life.

220.   Minnesota Life, as an insurance company selling permanent life insurance, is subject to federal BSA and AML rules.

221.   Further, pursuant to AML rules codified at 31 C.F.R. § 1025.320(a)(2)(iii), Minnesota Life should have determined that the transactions "ha[d] no business or apparent lawful purpose or [were] not the sort in which the particular customer would normally be expected to engage."  Its failure to do so was negligent.

222.   Plaintiffs were retirees living on a limited fixed income who needed their retirement savings for immediate use. Plaintiffs' initial partial premium payment for the Policy was approximately $205,000—well in excess of the $5,000 threshold triggering AML rules.

223.   Even a cursory investigation of FIP would have would have uncovered the fact that the only reason Plaintiffs believed they could "afford" the Policy was the negligent misrepresentation that concentrating the remainder of their life savings in a single, unregistered security (i.e., FIP) would provide them with sufficient distributions to cover the policy premiums.

Minnesota Life should have, but negligently failed to, determine that such a concentrated investment was an unacceptable risk for individuals such as Plaintiffs.

224.    If Minnesota Life had performed its statutorily required duties, it would have uncovered facts showing that the permanent life insurance policy recommended to Plaintiffs was improper.

225.    Defendants' breaches proximately caused Plaintiffs' harm.

226.    As a result of Defendants' negligence, Plaintiffs suffered significant financial harm.

227.    Defendants' negligence was a substantial factor in causing Plaintiffs' significant financial harm.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**

**FLORIDA 517 CLAIMS**

</div>

228.    Plaintiffs incorporate by reference paragraphs 1 through 131 as though fully set forth herein.

229.    Fla. Stat., Chapter 517 contains Florida's Securities and Investor Protection Act, including the anti-fraud provisions of Fla. Stat. Section 517.301.

230.    Chapter 517.301 provides that it is unlawful in the State of Florida for a person, in connection with the offer, sale, or purchase of any investment or security, to employ any device, scheme, or artifice to defraud, to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

231.    The provisions of Chapter 517.301 do not require proof of any intent to deceive, in that negligent misrepresentation of a material fact or any negligent omission can serve as a basis for rescission.

232.    Pursuant to Fla. Stat. Sections 517.211(2), any person selling a security in violation of Section 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent that has personally participated or aided in making the sale, is jointly and severally liable to the person in an action for rescission.

233.    In connection with Plaintiffs' purchase of the FIP securities, the Jarvis Defendants were sellers of the FIP securities.

234.    In connection with Plaintiffs' purchase of the FIP securities, Shurwest was also a seller of the FIP securities, as Shurwest provided the selling materials to the Jarvis Defendants for transmittal to Plaintiffs, provided directions to the Jarvis Defendants as to the methodology of payment for the FIP securities for transmittal to Plaintiffs, received initial payment from Plaintiffs for the purchase of the IUL Policy being funded by the FIP securities purchase, "scrubbed" the FIP securities purchase application paperwork, answered questions by Plaintiffs and the Jarvis Defendants as to how the FIP/IUL Package worked and otherwise facilitated the purchase of the FIP securities by Plaintiffs.

235.    The Jarvis Defendants and Shurwest directly participated and aided in making the sales of the FIP securities to Plaintiffs.

236.    As alleged above, the Jarvis Defendants and Shurwest made affirmative misrepresentations to, and negligently concealed material information from, Plaintiffs all as set forth in Paragraphs 50 through 66 above.

237.     Minnesota Life, as principal of Shurwest and the Jarvis Defendants, and Shurwest, as principal of the Jarvis Defendants, is also jointly and severally liable for those misrepresentations under Fla. Stat. Section 517.211(2) to Plaintiffs in this action for rescission.

238.     As a result of Defendants' violations of these provisions of Florida's Securities and Investor Protection Act, Plaintiffs are entitled to rescind the aforementioned purchases of FIP securities and to seek other damages for which each of Defendants is liable, jointly and severally and including reasonable attorney's fees.

239.     Pursuant to Fla. Stat. Sections 517.211 and 517.30, Plaintiffs demand of Defendants rescission of the aforesaid purchases of FIP securities, together with interest at the applicable statutory rates as well as their reasonable attorney's fees incurred in bringing this action.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.     Statutory damages, including rescission of Plaintiffs' transactions;

2.     Compensatory damages in an amount according to proof, but not less than $4,300,000 as well as repayment to Plaintiffs of all payments made to Minnesota Life to secure life insurance on the life of Plaintiff Janice Zelinski;

3.     Special damages in an amount according to proof;

4.     General damages in an amount according to proof;

5.     An accounting of all of Plaintiffs' transactions;

6.     Restitution and unjust enrichment in an amount according to proof;

7.    Attorneys' fees and costs of suit under any agreement, statute, or law providing such entitlement,

8.    For pre-judgment interest on all damages at the maximum legal rate;

9.    For punitive and exemplary damages;

10.   For such other further relief as the court may deem just and proper.

### **JURY DEMAND**

Plaintiffs demand trial by jury as to all issues so triable in this action.

Dated: July 2, 2020

<div style="margin-left:40%">

Respectfully submitted,

THE PEARL LAW FIRM, P.A.

By:  */s/ Robert J. Pearl*
ROBERT J. PEARL
Florida Bar No.: #0255297
*Attorneys for Plaintiffs*
4521 Executive Drive, Suite 101
Naples, Florida 34119
Tel.: (239) 653-9330
Fax: (239) 653-9377
Email: robert@investorattorneys.com

</div>